May it please the Court. Good morning. James Kinney on behalf of Appellant Richard Barcomb. We respectfully believe the District Court erred in finding that Mr. Barcomb did not engage in protective activities in the months leading up to his termination by GM. The statute in question, 49 U.S.C. 30171, is relatively new. It was passed in 2012 as an addition to the Motor Vehicle Safety Act in 1966. Section 30171 applies vertically throughout the automotive industry in workplaces of parts suppliers, manufacturers, and down to dealerships. Let me ask you something. I'm not asking this just rhetorically. I have not looked to see if there's any legislative history. Correct. If you look to see if there's legislative history to this statute as to what it was intended to, the issue it intended to address are the problems that it was directed towards? Yes, sir. In our opening brief, we cited to what's the public law that enacted it, and it references transparency and accountability, enhancing that within an auto industry because there was, in 2010, some concern that auto the government would have been interested in investigating. And further, in our reply brief, we state further information from a Senate committee report that discusses in detail that history as well as specifies that this law was intended to protect, among others, mechanics and production workers in this industry, those types of people like Mr. Barcomb who Section 30171 only applies to post-manufacturer whistleblowing. Both GM and the district court read into the statute requirements that are not there. Neither the Act nor Section 301 says anything about providing information related to a legally cognizable defect, a defect in a legally defective vehicle, or a defect in a completed vehicle. In other words, Section 30171, when they talk about a defect, they often qualify what that means. For example, in 30118C, the statute clarifies that defect means defects related to motor vehicle safety, and that's specific to that provision. And then the statute enacted after in 30172A6, it's a separate whistleblower provision that's not at issue here. They took the language from 3017181, which is at issue, and they added to that a qualifier that defects must be those that are likely to cause an unreasonable risk of death or serious physical injury. But that language, those qualifiers are not present in 30171. And we think it is clear that if Congress had intended some more limited meaning, some more meaning that circumscribed as sort of suggested by the district court, it would have stated so. And I think there's also this important principle of statutory construction that if Congress intended a difference in meaning, they would have used the language in the different part of the act to do so. But they did not. The actual words of 30171 is what I would like to focus on, because I think they make clear that Mr. Barkum was engaged in protected activities. Section 30171A1 protects employees who, among other things, provide information relating to any motor vehicle defect. And I'd like to step back for a second, because we all know what we're talking about here. This is motor vehicles. This is GM. The district court put an undue emphasis on one word from the definition of motor vehicle from 1966 to read into it. Again, requirements that are not stated therein. The real question raised by me, and the act answers that at section 30102A3, it defines a defect broadly and in an open-ended fashion as including any defect in performance, construction, design, a component or material of a motor vehicle or motor vehicle equipment. So to break that down, it includes by its own plain text, a defect in the construction of motor vehicles. Defects like those that Mr. Barkum was reporting in the manufacturing facility itself. It also includes defects in performance. Didn't the district court look at this as complaints about a defect in the process, the internal production process, not necessarily a defect in the vehicle? The district court appears to have relied on a few misstatements or misunderstandings of what Barkum was reporting. What Barkum was reporting is not just that defects in a man-made process occurred and came up and needed repair. What he was reporting were motor vehicle defects with serious safety implications that were being falsely or fraudulently confirmed as repair in GM's system. He was concerned about the risk that that created in defects going out of the plant unnoticed and unrepaired in that system that GM does not dispute exist both during and after the manufacturing process to record and account for the existence of motor vehicle defects, the repair of them, and the confirmation of the repair of them. And that admission is clear at Appendix 1076. GM does not dispute that motor vehicle defects exist during the manufacturing process. And I think that the district court relied on a misunderstanding of what the substance of his reporting was. If you see in its decision, he sort of relates it as just, you know, the fact that we're all imperfect and that mistakes get made. But that's not what he was reporting. He was reporting vehicles, specific defects in vehicles that were confirmed to him as have already been repaired. And that was not his job to identify and fix vehicles that were already confirmed as repaired. And the reason he explained in detail what GSIP was and, you know, what its significant was. Will you remind me? I don't remember from the record. Did any of these complaints relate to defects that left the factory or not? So we did present in the summary judgment record evidence of a defect leaving a serious motor vehicle defect with safety implications leaving the plant due to the exact misconduct that he was reporting. The false or fraudulent confirmation of these repairs in GSIP. And that is reflected in Appendix 680 to 687. But that was not known, was it? That's the pin that was in the steering column and it was not known to be in existence until after? That's correct. It was discovered in discovery, right? That's not, well, my client knew about it because it came to light it was a big deal at the plant. And this is exactly what he had been talking about for three months previously when he first filed a corporate aware line complaint because he saw nothing being done about this issue that he sort of observed for months and months and months in less serious defects. But when he saw the serious defect, he filed that in September of 15. That came to light in December of 15, correct? Is there any way that we can make that relate back before the whistleblower complaint? Well, I think it directly relates to the information that he was providing about motor vehicle defects. I'm not sure if I understand your question, Your Honor. But we do believe that that relates to, directly relates to his reporting. In fact, it confirms in our view the objective reasonableness of what he was doing and reporting and the serious concern that lay behind it. How many complaints did he make, if you know, that relate directly to defects that were reported through their system that were then shown as fixed but were in fact not repaired? Yeah, so he at least identified one which was a broken power steering plug in September 26, 2015. And he identified specific members of management who were responsible for that and who he was concerned about just trying to make their numbers look better to do that. So he reported that and he had two interviews with a corporate special investigator in October and November of 15. He resumed reporting more defects because he kept a list of them and the spring of 15 as he continued to have contact with the special investigator. And so the exact number, I don't have that for you, Your Honor. But if you look in some of the exhibits that were included within the summary judgment record, he identifies them by specific job number. He describes the defect in particular in relation to some of them such as a broken ground wire on an airbag system. He explained exactly why that was a serious safety defect. And moreover, if you look at the investigative papers that were created by the corporate investigator, he himself notes in his audit notes, this is a serious safety issue. And these are all defects that were noted in the GM system and then were reported to have been repaired but in fact were not repaired? That's correct. And so we believe that admission at 1076 shows that there really is no genuine dispute that these defects, motor vehicle defects do exist in process. And I think you would have to disregard the record and or add words or rewrite the statute to avoid that conclusion. And I think it's also important to note that Section 30171 is unique in how it is drafted. Unlike other whistleblower statutes, it is not written or framed exclusively around the reporting of actual or alleged violations. It lists three things of relevant under A1. First, any motor vehicle defect. That is a very broad phrase, as I've explained. Separate and apart from that, it pertains to the two large features of the Act's actual requirements, which are noncompliance, so not complying with the minimum safety standards that are set forth in 49 CFR 571, as well as actual or alleged violations of the notification reporting requirements, which are reflected throughout the Act and the statute and elaborated on further within the regulations. So, any motor vehicle defect, that phrase is just not redundant. It's not synonymous or coextensive with what the Act requires or its coverage. And the Eighth Circuit has previously acknowledged in the Haley case that the relevant analytical framework is starting with the statute itself. Start with the language and end with the language. If it's unclear, the court is obligated to consider the purpose of the statute. It's obligated to consider its legislative history, as well as the context and circumstances surrounding its enactment. And we believe the district court did not do so. In our briefing, again, we set out what we believe is clear and compelling information as to Congress's intent here. It intended to broadly protect the reporting of defect-related information throughout the industry because the industry needed it. And it's significant to note that at the time this was put into effect, Congress added a note under the General Policy section of the entire Act, 30101. And in that note, they directed the Secretary of Transportation to publicize the means for contacting the National Highway Traffic Safety Administration to target, among others, manufacturer personnel and mechanics. And that can be found at 126 Stat 763. In other words, these are the people involved in construction of motor vehicles. We believe that the intent of MAT 21 was to create channels for those within these facilities to speak up without fear of retaliation or reprisal, as Mr. Barkham did. The summary judgment record confirms that the repair confirmation process, its purpose, is to protect customers and ensure the accountability of these repairs. This is what, in essence, motivated Barkham. He was reporting serious defects, broken power steering plugs, broken ground wires on airbag systems. The type of stuff that, if it left the plant, would either cause a car to not have its airbag deployed in an accident or could cause a sudden loss of power steering. And the record reflects in the deposition testimony of Bobby Morrison and Rick Barkham that these are real possibilities that would happen if these things were not caught and second-guessed in the process. It is critical to remember, again, that the information he provided was not, as the District Court stated, limited to the G-SIP system itself, removed from all these considerations that I've described. He explained the G-SIP system because he thought it pertained to why he was seeing what he was seeing. What he was seeing, again, was these false or fraudulent repairs. And G-SIP was used in the plant to not only meticulously measure plant production and management performance, it was also used to investigate the origins and causes of these defects if and when they left the plant. This was not a mere task-tracking system, as GM intimates on appeal. And again, I'd like to emphasize, this is not about buff marks. He saw those for months and months throughout 15. It was in September when he saw a really serious defect that had serious safety implications that he escalated his concerns because nothing, they kept happening. It was a pattern in practice. And he said, I'm one of 18 in this facility. Who else is out there who sees these things as repaired, believes they're repaired, and it gets out as a result? The district court stated in its decision that he did not report specific instances of vehicle defects to management and that Section 301.7.1 does not apply to the misconduct of plaintiff's co-employees. But neither of these statements are accurate or reflective of the summary judgment record. He provided not only specific defects, as I've outlined here today, to management, but in many levels of management, mind you, he also provided this information about management to management being engaged in this dangerous practice. This is not him merely complaining about the misconduct of another employee. He's not complaining about having to do his job and repairing defects identified as needing repair. And what's critical to remember in this, too, is that the information he provided led to a major vehicle safety product investigation by GM, which showed, well, one, that was overseen and involved consultation with multiple GM executives and attorneys. It created a lot of work for and scrutiny of local management during a time period of particularly heightened pressure to increase plant production on two of GM's most profitable vehicles, vehicles which were exclusively manufactured at Wentzville. And finally, it showed that this pattern of practice of false repairs was occurring exactly where he said it was, at the end of the line, and it resulted in several corrective actions to the defect repair process at GM. So in conclusion, I see that I'm out of time. In short, I don't believe the court applied the language as written, followed the correct analytic framework. It's not as narrow as it suggests, and I think they made material factual missteps in not construing the record as a whole. Thank you for your time. Thank you. Ms. Schuster, when you're ready. Thank you, Your Honors, and may it please the Court, I'm Stephanie Schuster here on behalf of the Appellee General Motors. Would you turn the microphone down just a bit? Is that better, Your Honor? Yeah. Sure. The lectern will go up and down, too, if you want to lower it. I feel pretty comfortable. That's good. Thank you. This case is about one form of protected activity under MAP-21, reporting information about motor vehicle defects, and this appeal turns on a straightforward interpretation of that statutory phrase. For two distinct reasons, plaintiff's reports about the alleged misuse of G-CIP were not reports about a motor vehicle defect within the meeting of the statute. First, at common law and in the Vehicle Safety Act, the word defect refers to flaws that are present in vehicles when and after they leave the manufacturer's hands, not problems that arise and are addressed during the manufacturing process. What if they're not addressed, though? If they're not addressed in the vehicle ships, Your Honor? Well, what if you know that vehicles are being manufactured with a defective part? You're saying that you're not protected if you report that. So we have to sort of look at the whole context of MAP-21. There's a list of protected activity. Among that is reporting about motor vehicle defects, the post-manufacture period. Right after it is reporting noncompliance with vehicle safety standards. Using a defective part or an obsolete part in a vehicle, a practice of doing that would be noncompliance with vehicle safety standards. This case isn't about that. This case is about the one theory that this plaintiff has pursued is that he reported information about motor vehicle defects. Why isn't a part that's not manufactured properly a defective part? A part that's not manufactured properly that comes to GM for use in the product? Or that's not installed properly. Why is it not defective if it's not installed properly? Because... Or something's left... Sure. You don't put a pin in. Sure. Doesn't that make the part defective? Sure. A product, you have to look at the meaning of the word defect. So as counsel noted, the statute gives a definition of defect, but it doesn't actually define the word defect. It uses the word defect and then limits its scope. It's well settled that when Congress borrows a term like defect from the common law, absent some contrary indication, the courts have to presume that Congress intended to take the borrowed terms' established meaning. And at common law, a defect in the manufacturing context is a departure from intended design. It is not possible for a product to have departed from its intended design until the manufacturing process is over. Departure from intended design is a disparity between how it was manufactured and how it was supposed to be. Until the manufacturing process is done, the manufacturer still has an opportunity to correct any errors because errors are a natural part of the manufacturing process. But what about when they say they've corrected it and he knows it hasn't been corrected? Why would that not be covered? So what he reported is that vehicles came to him with the electronic system, G-SIP, having he alleged it was incorrectly reported as repaired. Someone else was taking credit for work and then sending it for him to do. The reason he knew about those defects wasn't because he was just double-checking the full vehicle. It came to him because it needed repair and because the G-SIP system is a redundant system. It came through on paper tickets. Each one of the alleged vehicles that plaintiff found repairs that needed to be repaired but were marked as complete in G-SIP, the plaintiff had reason to know that those repairs needed to be made because of the paper tickets or a note on the windshield and he in fact made those repairs. So all the defects were repaired by him? Is that what the record reflects? That is what the record reflects. With the exception of the one that we discussed with counsel. Correct. But other than that, it was his job to repair all these things that came into him? Correct, Your Honor. So plaintiff's, the entire purpose of plaintiff's job in what was called the final process repair department was to repair needed repairs, make needed repairs after a product comes off the initial line. So the issue was it was in, the repair was noted as made in one system and not in the other system. Correct, Your Honor. He looked at both? Correct, Your Honor. And those, and product, vehicles were not directed to this final process repair department unless there was a flag saying repairs were needed. That's why they came to plaintiff. And he did his job. He did his job. None of these vehicles were shipped to market. The only instance that plaintiff identifies in his briefing is an instance that was not one that this plaintiff complained about, the steering column bolt. Someone else, this happened, he said he knew about it. Counsel admitted it during argument. He said he knew about it. He never reported this to GM and it could not possibly have been the basis for his termination and that is why the district court disregarded it. But isn't that exactly the point is that by reporting this to GM, I would think GM would want a person to be protected who reports these kind of problems. I mean, why wouldn't GS want them, GM want them to be protected so that if you know that problems, safety, serious safety issues have been identified as not being fixed, I would think GM would want the public to know that you're going to protect those people. Sure, Your Honor. Two responses to that. First, to be very clear, GM took Mr. Barkham's reports very seriously. It conducted a- But you say he has no protection, Senator. Whether we took it seriously and it was important to us is a different question about whether it constitutes a motor vehicle defect under this limited slice of the MAP 21 statute. And it does not. As a matter of plain language, it simply is not a defect. So GM's position is no protection if you report safety defects in the production process? Well, no protection as a motor vehicle defect, Your Honor. We have to remember that there is a broad swath of activity that is protected under MAP 21. The plaintiff made, for whatever reason, a decision to pursue this claim likely because he would not have been able to demonstrate that he thought there were violations of safety standards because, again, all of these things were fixed. But the plaintiff limited his claim to reports about motor vehicle defects. That is the sole focus of this case. It doesn't mean you're going to eviscerate the protection of MAP 21. MAP 21 has a role to play, particularly in the manufacturing process. The Vehicle Safety Act, when it talks about the manufacturing process, it only does so in connection with those safety standards. The vehicle safety standards govern how manufacturers need to design and build the vehicles. Separately, the Act talks about defects only in the context of the time period after the product leaves the manufacturer's hands. In relation to a manufacturer's obligation to recall vehicles from the market. So a manufacturer has to notify owners of these vehicles of a defect. They have to repair or replace or refund fully for these defective vehicles. And they have to maintain records of the first purchaser precisely because they need to be able to carry out these recall obligations. The only other time the Act talks about defects when it's not with the ultimate purchaser is it similarly requires manufacturers to repair or replace or refund vehicles it has sold to a distributor or a dealer but that have not yet been sold to the ultimate consumer. Nowhere in the Act is the word defect used at any earlier stage and certainly not in the midst of the manufacturing process. Separately, the alternative ground that we have raised is that while the Act doesn't give you a definition of the word defect, it does limit its scope. And as the plaintiff conceded in his reply brief at page 20, that by the plain language that means defects of a motor vehicle. And based on the plain language, the only other circuit to have considered this question, the DC Circuit, has concluded that there must be a defect in the vehicle or its parts themselves regardless of whether it manifests in the performance, construction, components or materials of a motor vehicle. The plaintiff takes the word construction out of context and says that must mean how the vehicle is manufactured. That is not the use of construction in the statutory definition where it says performance, construction, components or materials. Reading construction in light of the other words in that same list clearly refers, as the DC Circuit concluded, to how soundly the vehicle is built. So if it's not welded properly, there's a defect in its construction because it's defective construction. It's not the entire manufacturing process. Again, Congress used vehicle safety standards when it was talking about how vehicles need to be manufactured during the process. And construing the record as a whole, the District Court correctly found that plaintiff's complaints here were about the misconduct of employees in connection with the G-6 system and not about any problems with specific vehicles. As he conceded, he was not complaining about the fact that vehicles were coming to him needing to be repaired. That was his job and he did his job. The only variable here is that the alleged misuse of G-6 and that other employees were attempting to take credit for work they didn't do and then shoving it off to plaintiffs so that he could actually do the work. That is why he complained. That's what he complained about. That is not a motor vehicle defect, which is an alternative reason. But wasn't he complaining about the fact that because he found that there were problems identified that had been certified as being fixed and weren't fixed, and then he repaired them. So those are okay. But that must speak, what does that say about all the others that he couldn't find that were maybe in the manufacturing process were, in essence, hidden from his inspection? Isn't that what he was really complaining about? No, Your Honor, because he never complained that the paper tickets also were not tracking these repairs. He never complained that vehicles were coming to him for no reason and that he was just doing extra work by evaluating them to try to find defects or that he was supposed to guess where needed repairs, sorry, he was supposed to guess what needed to be repaired because there was no indication. These vehicles came to him exactly as intended. There's a reason that General Motors has a redundant system to make sure that these needed repairs, if missed in the electronic system, are caught on paper and vice versa and that it worked exactly as intended. So whether it was plaintiff or any of the other 18 repair persons in final process repair, if they were doing their job and making the repairs that were flagged for them, then what he was reporting about was, again, just this misuse of G-CIP. And it's important to note, he was concerned that people were fraudulently, as he reports, that are falsely confirming repairs as completed in G-CIP because they were trying to manipulate performance metrics. They were trying to take credit for work they didn't do, as the district court found. He wasn't reporting that this was making it impossible for him to do his job because there was, again, another way for him to identify repairs that were needed before he went in to actually make those repairs. And just lastly, I'll point out for the court, again, this plaintiff has waived any other theory of protected activity. There are some other ones he alludes to in his reply brief, and it was unclear to me from counsel's opening whether a plaintiff was saying that he engaged in other types of activity other than engaging in a motor vehicle defect. The record is crystal clear. In opposing General Motors' motion for summary judgment, the plaintiff argued that he engaged in only one form of protected activity and in only one way, reporting about motor vehicle defects by reporting about this G-CIP issue. Everything else is waived. It is settled law here in this circuit. In your Honor's cold decision, that if you don't oppose, if you don't raise a ground in opposition to summary judgment, you forfeit the right to raise that ground on appeal. Unless the court has any further questions, we would ask that the district court's judgment be affirmed. Thank you. Seeing none, thank you very much. You used all your time, but you look like you're trying to tell me that you'd like to say something. I'll give you permission to close with one minute. Oh, does he have three minutes left? No. Oh, that's hers. It's hers. I'll give you a minute. Thank you, Your Honor. First, I'd like to correct the record that in that first example, September 26, 2015, that was falsely confirmed in both systems. It wasn't just in one or the other, and we made that clear in our reply brief. Second, he filed a MAP-21 complaint two weeks before he was discharged and told GM he was doing so. We allege that as a protected activity in our complaint. Third, the D.C. Circuit opinion she references is from 1988. It's about performance defects, and that is, as the court held itself, highly fact-specific as an enforcement action. It had nothing to do with the nature and scope of protected activities under 30171. And fourth, we don't believe we weighed any argument. They raised one singular argument below with the district court. We responded to that in full. They have a one-throwaway sentence in there about the other activities he engaged in and reporting obsolete use of obsolete parts and new vehicle defect repairs. And moreover, the summary judgment packet that we submitted to the court reflects in detail all of the factual basis for those claims. Thank you, Your Honor. Thank you. Thank you very much for your time here this morning. We'll take the case under advisement, and we'll have the clerk call the final case for this morning.